IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| MICHAEL HOBBIEBRUNKEN, ) | |
| KEVIN HOBBIEBRUNKEN, ) | |
| BRIAN HOBBIEBRUNKEN ) | |
| ) | |
| Plaintiffs, ) | **CIVIL ACTION** |
| ) | |
| v. ) | Nos. 11-1385-MLB |
| ) | 11-1386-MLB |
| TOM VILSACK, SECRETARY OF ) | 11-1387-MLB |
| THE UNITED STATES DEPARTMENT ) | |
| OF AGRICULTURE, et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER**

Plaintiffs[1] filed actions against defendants seeking judicial review of an agency action pursuant to 5 U.S.C. § 1501, et seq. Plaintiffs farmed land in Morton County, Kansas in 2009. Defendants are the Secretary of the Department of Agriculture, the Risk Management Agency (RMA) of the U.S. Department of Agriculture (USDA), and the Federal Crop Insurance Corporation (FCIC). Plaintiffs bring this action seeking a court order overturning RMA's Good Farming Practices determinations for plaintiffs' 2009 dryland corn crop. The court has reviewed the briefs submitted by the parties and the administrative record.[2]

---

[1] Plaintiffs Kevin and Brian are plaintiff Michael Hobbiebrunken's sons. Plaintiffs have filed three separate actions which have been consolidated for discovery purposes. The undersigned judge was assigned all three cases after it was determined that the issues on review are very similar. Any factual differences in the cases will be noted throughout the opinion.

[2] Case No. 11-1385-MLB, Docs. 21, 24, 27, 30; Case No. 11-1386-MLB, Docs. 23, 26, 29, 31; Case No. 11-1387-MLB, Docs. 16, 19, 22, 25.

**I.   Background**

Plaintiffs bring this action pursuant to 7 U.S.C. § 1501 et seq., known as the Federal Crop Insurance Act (FCIA).  The FCIC is an agency of the USDA and the RMA performs certain duties on its behalf.  7 C.F.R. part 400 contains the regulations implementing the FCIA, which includes the agencies' roles in crop insurance.  Plaintiffs' policies and the majority of crop insurance policies are sold to and serviced by private sector Approved Insurance Providers (AIPs) who have entered into a Standard Reinsurance Agreement (SRA) with the FCIC which provides reinsurance to the AIPs.

The crop insurance contract is entered into between the AIP and the producer after an application is submitted specifying the crop and land that has been designated as insurable.  There are two types of policies available: yield-based and revenue-based.  Plaintiffs obtained revenue-based insurance for dryland (non-irrigated) corn in Morton County, Kansas for crop year 2009.  This type of policy has a target level of revenue which is based on market prices and production.

The FCIA provides that coverage "shall not cover losses due to . . . the failure of the producer to follow good farming practices, including scientifically sound sustainable and organic farming practices."  7 U.S.C. § 1508(a)(3)(A)(iii).  The regulations define "good farming practices" as follows:

> The production methods utilized to produce the insured crop
> and allow it to make normal progress toward maturity and
> produce at least the yield used to determine the production
> guarantee or amount of insurance, which are: (1) For
> conventional or sustainable farming practices, those
> generally recognized by agricultural experts for the
> area . . . [The AIP] may, or [the insured] may request [the

-2-

>    AIP] to, contact FCIC to determine whether or not
>    production methods will be considered to be "good farming
>    practices."

7 C.F.R. § 457.8.

## II. Facts and Procedural History

Plaintiffs rented land approximately 10 miles north of Elkhart, Kansas, from Steven Miller for crop year 2009. Elkhart is located in the very southwest corner of Kansas. Plaintiffs were first year producers in Kansas. Brian and Kevin were first year farmers. Michael, Kevin and Brian farmed approximately 1807, 1809 and 1758 acres, respectively. Together, plaintiffs planted 5375 acres of dryland corn.

Plaintiffs obtained insurance policies from AIP Argo National Inc. for dryland (non-irrigated) corn. Plaintiffs chose the Enterprise Unit (EU) option to insure the crop, which is defined in the policy as a "unit that consists of all insurable planted acreage of the insured crop in the county in which [the named insured has] a share on the date coverage begins for the crop year." R. at 47. Plaintiffs planted different seed varieties on their land between May 16 and June 2, 2009. The seed was then sprayed with weed control applications on various dates. Michael sprayed the majority of his land in late May, within days of the planting, with the exception on one section which was sprayed in early July. Both Brian and Kevin sprayed their land in late June and early July.

On June 13, 2009, the area was hit by a moderate to severe hail storm. The corn was in different growing stages depending on the planting date. At the time of the storm, plaintiffs were prepared to fertilize the crop with nitrogen but did not do so. Plaintiffs

believed that the crop had a poor stand after the hail and drought conditions.

On July 20, after waiting to see if the corn would recover after the hail storm, plaintiffs filed a Notice of Loss with AIP Argo National, claiming drought and hail as the cause of loss. In support of their claims, plaintiffs submitted letters, pictures, evidence of a hail storm on June 13, seed information, weather data, and invoices and records for weed control applications. Plaintiffs' records were not individualized; i.e. all seed was purchased by Michael and the spray records were in Michael's name. Kevin submitted weather data from Kansas State University indicating that Elkart received 4.55 inches of precipitation, and the weather station identified as Richfield 10 WSW received 4.83 inches of precipitation between January 1 through June 30, 2009. 3.53 inches of precipitation fell in July 2009. Total precipitation showed either 8.08 or 8.36 inches of rainfall. Drought Monitor Archives for Kansas reflect that Morton County was either "Normal" or Abnormally Dry" during the weeks of April 7 through July 14. "Abnormally Dry" is not a drought condition, but is the moisture condition closest to "Normal," and is the mildest of the five condition levels in moisture monitoring.

On July 21, the Farms Service Agency (FSA) took photographs of plaintiffs' crops. AIP Argo National visited plaintiffs' fields on August 24 and 25 and took photographs. Argo National concluded that the hail storm which passed through Morton County on June 13 had a high probability of hailing on plaintiffs' fields.

On February 23, 2010, Argo National wrote to the Topeka Regional Office (TRO) of RMA requesting a "good farming practice [GFP]

-4-

determination" regarding farming practices employed by plaintiffs during crop year 2009. Bulletin MGR-05-010 ("GFP Bulletin"), addresses GFP determinations and provides guidance regarding how GFP determinations are to be requested and made. The GFP Bulletin states that if the AIP cannot make a decision regarding GFP based on available information, the AIP then may request in writing that the RMA Regional Office make the GFP determination.

The GFP Bulletin provides that the GFP determination is based on the following:

> 1. The agronomic situation of the producer, which includes material facts about the production methods that were used or will be used to produce the crop as well as weather and climate factors, pest or disease risks, etc. that affect the crop; and
>
> 2. The opinion from at least one agricultural expert . . . ; [and]
>
> 3. Whether the production method used by the producer will:
>
>    a. Allow the insured crop to make normal progress toward maturity;
>
>    b. Produce at least the yield used to determine the production guarantee or amount of insurance, including any adjustments for late planted acreage;
>
>    c. Not reduce or adversely affect the yield; and
>
>    d. Be generally recognized for the area . . . .

R. at 758-759. A production method that does not meet the standards set forth in the GFP Bulletin is not considered an approved GFP.

On May 28, 2010, the TRO issued its GFP determinations. The TRO found that plaintiffs failed to establish that they determined soil fertility or failed to carry out an adequate fertility plan, failed to implement adequate weed control, and failed to plant an appropriate seed selection. The TRO decisions listed 28 supporting exhibits cited

-5-

in the determination letter and 29 exhibits which were reviewed but not cited.[3] Plaintiffs requested reconsideration of the decisions by the RMA Deputy Administrator for Insurance Services in Washington, D.C. Plaintiffs submitted a brief and included a report from Dr. Daniel Krieg, a crop physiologist. On December 10, the decision was affirmed. The RMA GFP Reconsiderations only applied to the determinations of GFP. There is no evidence in the record that plaintiffs' 2009 losses have been determined to be the result of their failure to follow good farming practices.[4]

### III. Review of Agency Decision

Under the Administrative Procedure Act, 5 U.S.C. § 706, the court may set aside an agency's action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Citizens' Comm. to Save Our Canyons v. Krueger, 513 F.3d 1169, 1176 (10th Cir. 2008). "The duty of a court reviewing agency action under the 'arbitrary or capricious' standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." Id. Furthermore, the court must "determine whether the agency considered all relevant factors and whether there has been a clear error of judgment." Id. "A presumption of validity attaches to the agency

---

[3] The administrative record in this case is 2685 pages long.

[4] The reconsideration letters issued by the RMA implies that the AIP will assess an amount for plaintiffs' failure to follow GFP. R. at 36. The policy provides that no coverage is allowed if the loss was caused by the failure to follow good farming practices. R. at 54. The record does not include a final determination on plaintiffs' claims. Presumably, this appeal halts the claims process as the GFP determination would have an impact on the actual loss determination by the AIP.

action and the burden of proof rests with the appellants who challenge such action." Id. (quoting Colo. Health Care Ass'n v. Colo. Dep't of Soc. Serv., 842 F.2d 1158, 1164 (10th Cir. 1988)).

**A.     Consideration of the Record**

Plaintiffs contend that RMA's decisions failed to consider the drought conditions that plaintiffs assert caused their crop losses. According to plaintiffs, the lack of rain, heat and wind, and the hail storm all "played into the big picture." Br. at 10. Plaintiffs cite to provisions in the Loss Adjustment Manual (LAM) and contend that RMA failed to consider its provisions when deciding plaintiffs' claims. Reply Br. at 2-3.

Plaintiffs specifically assert that RMA failed to follow certain provisions in section 2 of the LAM which discusses uninsured causes of loss:

> G When loss is due to uninsurable cause(s):
>
> (1) Consider production on same or similar crop(s) on other farms in the area, if available.
>
> (2) Verify cause of loss (e.g. apparent loss may be poor weed control; however, the damage may have been indirectly caused by insufficient rainfall to activate a properly applied herbicide).
>
> ***
>
> (5) Determine efforts to prevent or control the situation (chemical used and/or methods followed). Record the number of applications and dates they were applied based on receipts or other third party records.
>
> (6) Determine efforts neighbors and others in the community used to prevent or control the same situation.
>
> (7) Photograph the evidence of the crop in question and surrounding farms, with identifying landmarks in each photograph.

R. at 1476-77.

-7-

Defendants respond that the LAM provides procedures for the AIP to determine a loss and that RMA is not required to determine a cause of loss. The LAM states that the "AIP is responsible for all loss adjustment responsibilities outlined in [the LAM]." R. at 1158. Furthermore, the GFP determinations issued by RMA specifically state that the GFP process does not include whether or not an insured cause of loss was present. R. at 6. Plaintiffs have not provided any authority for their position that RMA was required to follow section 2 of the LAM when making a GFP determination. Therefore, the failure to follow the provisions in the LAM was not arbitrary and capricious.

The GFP Bulletin, however, does provide that the GFP determination must consider the agronomic situation of the producer, including weather and climate. R. at 758. The court finds that RMA's decisions did consider the weather conditions. RMA's decisions list all the documents that were considered by the agency, including weather records submitted by plaintiffs, plaintiffs' expert opinion and plaintiffs' briefs. Moreover, the reconsideration decisions set forth the weather information in the body of each decision and repeatedly reference the weather. R. at 19, 6, 7, 8, 9, 10, 11, 13. The administrative record clearly shows that plaintiffs' claims were based on drought and hail. The weather claims were not ignored.

The court finds that RMA's decisions considered the weather conditions but found that plaintiffs did not utilize good farming practices regardless of those weather conditions.

**B. Support for the Agency's Conclusions**

Next, plaintiffs contend that the three failures listed by the agency were not supported in the record.

### 1. Adequate Seed

RMA set forth its determination of a failure to plan an appropriate seed selection as follows:

> According to the documentation, you selected hybrids based on cost and did not provide supporting documentation for the seeding rate you planted, the selection of a medium maturity hybrid, that you planted at the end of the final planting period, or documentation that you used a hybrid suitable for grain production on dryland in southwest Kansas.
>
> You were aware of the growing conditions at the time and were beginning to plant in the final 15 days of the final planting date, May 31, 2009, for Morton County, Exhibit A.3. Other than economics, you provided no information that would support your decision to select the corn hybrids you planted rather than the hybrids recommended by your consultant. The corn hybrids you selected had not been tested for dryland production in southwest Kansas.

R. at 35-36, 1914, 1937-38.

Plaintiffs assert that the seed they selected was adequate because the results of the germination test were in the 93-95% range and Dr. Krieg, their expert, stated that all the hybrid seed met requirements of federal and state law. Plaintiffs argue that RMA's decisions that plaintiffs failed to plan an appropriate seed selection was not supported by any evidence.

Plaintiffs purchased a variety of seed. The seed type and its characteristics are set forth in RMA's decisions, which clearly state plaintiffs' position and also includes excerpts of Dr. Krieg's opinion. R. at 8-9, 15-18, 1903, 1905-06, 1912-14, 1921-22, 1928-29, 1935-38. Notably, RMA found that plaintiffs' crop consultant, Carl Speck, recommended 99 and 108 day corn early maturity hybrids from NK and Garst. Plaintiffs did not follow his recommendation. Rather, plaintiffs purchased medium maturity hybrids which averaged 110-118

days and which had not been tested in southwest Kansas.

RMA cited the K-State Corn Production Handbook (handbook) which stated that "choosing an appropriate hybrid is essential for successful corn production." R. at 35. The handbook further stated that "poorly adapted hybrids may yield 50 or more bushels per acre less than the best hybrids." R. at 211. Plaintiffs' expert noted that "maturity class is the most critical component defining adaptation to a particular environment." R. at 34. Plaintiffs, however, choose a seed with a longer maturity date even though they planted at the end of the planting season. Plaintiffs sole reason for doing so was economics. As noted by RMA, economics are not a valid justification in determining if a production method was a GFP. R. at 761.

On review, plaintiffs do not offer any evidence that was not considered by RMA. Plaintiffs also have no evidence to refute any findings made by RMA. The court finds that there is substantial evidence to conclude that plaintiffs failed to employ good farming practices when they did not utilize an appropriate seed selection. Hoyl v. Babbitt, 129 F.3d 1377, 1383 (10th Cir. 1997)("evidence is generally substantial under the APA if it is enough to justify, if the trial were to a jury, refusal to direct a verdict on a factual question.")

   **2.   Failure to Determine Soil Fertility or Carry out an Adequate Fertility Plan**

Plaintiffs assert that RMA erroneously concluded that they did not test the soil and the lack of an application of fertilizer showed that plaintiffs failed to use good farming practices.

-10-

<u>Soil Fertility</u>

With respect to the soil testing, plaintiffs assert that they did in fact test the soil contrary to the findings by RMA. In support of this conclusion, plaintiffs cite to Dr. Krieg's opinion which states that Speck collected soil samples and had them tested. Br. at 14. Plaintiffs, however, failed to offer any evidence that this ever occurred. The only soil samples submitted to RMA were those that were taken in December 2009. Plaintiffs argue, without any authority, that the nutrients in the soil in December 2009 were present in the soil prior to planting the corn in May.

The handbook states that the "most reliable means of determining fertilizer need is by soil testing regularly with continual support from other methods listed." R. at 27. Plaintiffs have not provided any evidence that they took any steps to determine the fertility of the soil <u>prior</u> to planting. Plaintiffs' argument is not sufficient to support a finding that RMA's decision was arbitrary and capricious.

<u>Fertility Plan</u>

Plaintiffs next assert that RMA ignored the fact that plaintiffs were prepared to apply fertilizer but did not do so because the hail had damaged their crops. RMA did not ignore plaintiffs' position. TRO RMA noted that the evidence submitted by plaintiffs was not clear and there was no documentation to indicate the purchase or application of fertilizer. On appeal, RMA found that plaintiffs had a duty, pursuant to the insurance contract, to protect their crop. RMA found that the duty to protect the crop required plaintiffs to apply fertilizer prior to July 20, the date of the claim.

The recommended nitrogen algorithm in the handbook provides that

-11-

40 pounds of nitrogen per acre are recommended to achieve the goal of 39 bushels per acre.  R. at 27, 219.  Dr. Krieg agreed with this calculation.  The handbook states that nitrogen may be applied before planting, at planting, and/or as a sidedressing after corn is up.  R. at 219.  The handbook states that nitrogen uptake by corn is about 25 days after emergence and that the applications should be made early.  R. at 219.  Plaintiffs planted their corn between mid and late May.  The hail storm came on June 13.  Plaintiffs did not apply nitrogen to their corn.

RMA determined that the failure to apply fertilizer was not a good farming practice.  RMA referenced the insurance contract which requires plaintiffs to provide sufficient care in the event of damage to the crop and further stated that plaintiffs should have immediately submitted a claim if they believed that there was hail damage.

Plaintiffs argue that RMA did not know the condition of the corn and that Michael's verified statement regarding the corn's condition is sufficient to find that the corn was damaged and fertilizer should not be applied.  Plaintiffs have the burden to show that RMA's decision was arbitrary and capricious.  RMA's requirement that plaintiffs provide evidence of the crop damage in June is not arbitrary and capricious.  RMA or the AIP had no knowledge of any potential damage to the crop in June 2009.  RMA's determination that plaintiffs had a duty to protect their crop and report a loss immediately is also not arbitrary and capricious.

The court finds that there is substantial evidence to conclude that plaintiffs failed to employ good farming practices when they did not determine soil fertility or carry out a fertility plan.

### 3.     Lack of Herbicide

Plaintiffs' crop had a significant weed problem. In the photographs of plaintiffs' land, the fields were overrun with bindweed. On some photos, it is difficult to distinguish where the stands of corn were located. Plaintiffs' crop consultant, Speck, recommended a weed control program that would specifically address the bindweed problem. Speck acknowledged that his recommendation was expensive. Plaintiffs did not follow Speck's recommendation but choose a cheaper alternative and did not purchase the herbicide which targets bindweed. Plaintiffs also only applied the herbicide on one occasion. Kevin and Brian sprayed their crop on various dates which ranged from 24 to 39 days after planting. Michael sprayed the majority of his crop a few days after planting, with the exception of one section which was sprayed 34 days after planting.

With respect to all plaintiffs, RMA determined that they had not utilized good farming practices because they only applied one application of herbicide, failed to provide documentation to support their weed control program and did not provide enough information to support the conclusion that the environmental conditions were extreme enough to render the herbicides ineffective. On review, plaintiffs contend that the agency failed to consider that the fields were tilled with a Sunflower 3300 Blade plow and that the hail and drought conditions affected the herbicide.

After a review of the RMA decisions, the court finds that the agency did consider plaintiffs' use of the plow. RMA considered the Argo letter which discussed the plow and plaintiffs' position that the plow was used to expose the weeds. In addition, Argo attached a video

-13-

demonstrating the plow.  Nevertheless, RMA determined that plaintiffs should have made subsequent applications of herbicide to the crop.  The photos show that the crop was overrun by weeds and that further action was necessary to control those weeds.

RMA determined that plaintiffs' single application of herbicide was a failure to utilize good farming practices.  Plaintiffs' argument concerning this determination is that the drought conditions would not have permitted a subsequent application of herbicide to be effective.  In its opinion, RMA cited the weather conditions in Elkhart, Kansas, during the time of planting and application.  RMA cited the rainfall during the relevant time period and noted that the recorded precipitation during the application period was 1.92 inches.  R. at 1911.  RMA found that the weather conditions were not extreme enough to render the application of herbicides ineffective.  Plaintiffs have not presented any evidence to rebut this conclusion by RMA.

Plaintiffs also failed to establish a herbicide plan for their crop.  Apparently, plaintiffs had no intention of applying any more herbicide to their crop.  RMA reviewed the products which plaintiffs used on their crop.  Two herbicides used by plaintiffs both stated that repeat treatments may be necessary.  R. at 1910.  In addition, the handbook states that corn is vulnerable to weed competition in the first four weeks and that in most fields weed pressure is too high for one application to be adequate.  R. at 30, 1909, 1932.  Plaintiffs have not attempted to rebut these facts set forth in the determinations and did not provide RMA with any evidence that one application of their herbicide was sufficient.  After a review of RMA's decision, the court finds that RMA's decision was supported by

-14-

substantial evidence.

### 4. Failure to Timely Respond

Finally, plaintiffs contend that the agency had a duty to make a timely investigation and inform them of their duty to continue to care for the crop. Plaintiffs, however, cite no provision to support their position that the agency has a duty to respond to a claim. The AIP is the entity that investigates and services the claims. RMA's duties are set forth in the record and they do not include an initial investigation into a claim. Moreover, plaintiffs' policy explicitly states that plaintiffs must protect the crop from further damage by providing sufficient care. R. at 55.

Therefore, RMA did not have a duty to respond to plaintiffs' initial claim made to the AIP.

## IV. Conclusion

For the above-stated reasons, the court rejects plaintiffs' contentions that RMA's decisions are arbitrary, capricious or contrary to substantial evidence.

The clerk is directed to enter judgment in favor of defendants in all three related cases.

A motion for reconsideration of this order is not encouraged. The standards governing motions to reconsider are well established. Comeau v. Rupp, 810 F. Supp. 1172 (D. Kan. 1992). Any such motion shall not exceed three pages and shall strictly comply with the standards enunciated by this court in Comeau v. Rupp. The response to any motion for reconsideration shall not exceed three pages. No reply shall be filed.

IT IS SO ORDERED.

Dated this __8th__ day of January 2013, at Wichita, Kansas.

s/ Monti Belot<br>
Monti L. Belot<br>
UNITED STATES DISTRICT JUDGE